IN THE UNITED STATES COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
SIERRA CLUB,                   )
                               )
          Plaintiffs,          )
                               )
     v.                        )     1:02CV02235(JR)
                               )
CHRISTINE TODD WHITMAN,        )
Administrator, United States   )
Environmental Protection Agency, )
          Defendants.          )
_____)
```

## EPA'S OPPOSITION TO PLAINTIFF'S
## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTION

Plaintiff Sierra Club filed the instant action against Defendant Christine Todd Whitman, Administrator, United States Environmental Protection Agency ("EPA"), pursuant to section 304(a)(2) of the Clean Air Act ("CAA") ("the citizen suit provision"), 42 U.S.C. § 7604(a)(2). Sierra Club alleges that EPA has failed to perform duties mandated by the CAA for the Washington, D.C., ozone nonattainment area ("D.C. Area"), and asks the Court to issue an injunction requiring EPA to discharge the duties addressed in Sierra Club's allegations. As explained below, no injunctive relief is warranted at this time as to two of Sierra Club's three claims. As to the third claim, the schedule proposed for EPA to take the duty at issue is unreasonable; the Agency should be allowed additional time to complete its rulemaking.

Sierra Club's complaint addresses EPA's obligations with respect to the D.C. Area under two provisions of the CAA. First, Sierra Club maintains that section 181(b)(2), 42 U.S.C. § 7511(b)(2), requires EPA to complete the rulemaking it has initiated to make a determination as to whether the D.C. Area attained National Ambient Air Quality Standard ("NAAQS") for ozone

by its statutory attainment date.[1]   The outcome of this rulemaking will establish whether the Area

should be reclassified or "bumped-up" from a serious to a severe ozone nonattainment area by

operation of law.   *Id.*   Second, Sierra Club maintains that EPA has a mandatory duty to undertake

rulemaking to either approve or disapprove two State Implementation Plans ("SIPs") for the D.C.

area submitted by the States[2] in 1999: (1) the attainment demonstration SIPs and (2) the rate-of-

progress SIPs.   *Id.* § 7410(k).

      With respect to the claims pertaining to the rulemakings on the bump-up and the

attainment demonstration SIPs, injunctive relief is not warranted at this time.   The bump-up claim

will soon become moot.   The Regional Administrator for EPA Region 3 will sign the final rule no

later than January 27, 2003, which is the deadline that Sierra Club has asked the Court to impose.

Declaration of Judith Katz, Director of the Air Protection Division, EPA Region III,   ¶ 9 (Dec. 2,

2003) ("Katz Decl.").   Given that the Agency is so close to completing the rule at issue by the

date proposed by Sierra Club, the extraordinary remedy of injunctive relief is not warranted for

this claim.

      Judicial consideration of Sierra Club's claim as to the attainment demonstration SIP would

be premature until after EPA has published the final bump-up rule.   If the D.C. Area is bumped-up

from a serious ozone nonattainment area to a severe area, the attainment date, the required

---

[1]     EPA has published a proposed rule on this determination.  67 Fed. Reg. 68,805 (Nov. 13, 2002).

[2]     The D.C. Area includes portions of Maryland and Virginia, as well as the District of Columbia.  For the purposes of this Memorandum, EPA will refer to these jurisdictions jointly as the "States."  *See* CAA section 302(d), 42 U.S.C. § 7602(d) (defining "State" to include the District of Columbia).

elements of the necessary attainment demonstration SIPs, and the deadlines for SIP submission by the States, will automatically change under the CAA. *See* 42 U.S.C. §§ 7511(a)(1), 7511a(d), and 7511a(i). In that event, EPA's statutory duties with respect to action regarding the attainment demonstration SIPs would not be triggered until the newly-applicable deadlines have been reached. Under these circumstances, the Court should defer the question of injunctive relief with respect to the attainment demonstration SIP claim until after the final bump-up determination, which will occur no later than January 27, 2003.

Finally, although EPA recognizes that it must take final action to approve or disapprove the rate-of-progress SIPs, the schedule proposed by Sierra Club does not allow the Agency sufficient time for the required notice and comment rulemaking. EPA will require until February 15, 2003, to sign the proposed rule;[3] the comment period will consume 30 days from the date of publication; and then the Agency will need 105 days after the close of the public comment period to evaluate the comments, complete the rulemaking process, and sign the rule. Katz Decl. ¶ 9. Although the date for final signature cannot now be stated with certainty because EPA cannot predict precisely when the proposal will be published in the Federal Register, thereby starting the 30-day comment period, signature of the final rule should occur during mid-July 2003.

---

[3] Although EPA can commit to a date-certain for signature of the final rule, EPA does not have control over the schedule for publication in the Federal Register. Based on EPA's experience, there is generally a period of a week or more between the transmission of a document to the Office of the Federal Register and publication of the Federal Register volume containing that notice. However, EPA has no control over the actual publication date. Under these circumstances, the Agency should not be subject to an injunction that would make the Agency responsible for guaranteeing publication by a set date.

**BACKGROUND**

**I.    STATUTORY BACKGROUND**

    **A.    Clean Air Act Overview**

    The Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, enacted in 1970 and extensively

amended in 1977 and 1990, establishes a comprehensive program for controlling and improving

the nation's air quality through both state and federal regulation.  Under Title I of the Act, EPA  is

charged with identifying air pollutants that endanger the public health and welfare, and with

formulating the NAAQS that specify the maximum permissible concentrations of those pollutants

in the ambient air.  42 U.S.C. §§ 7408-7409.  EPA has promulgated NAAQS for various

pollutants, including ozone.  *See* 40 C.F.R. Pt. 50.

    The CAA gives the States primary responsibility for ensuring that the ambient air meets

the NAAQS for the identified pollutants.  42 U.S.C. § 7407(a).  For each pollutant, a State must

draft a SIP that specifies emission limitations applicable to sources of pollution and other

measures necessary for the attainment, maintenance and enforcement of the NAAQS.  42 U.S.C.

§ 7410(a).  SIPs must meet numerous substantive requirements as enumerated in CAA section

110(a)(2).  42 U.S.C. § 7410(a)(2).  Each SIP must be adopted by the State in a legally

enforceable form after reasonable notice and a public hearing, and must be submitted to EPA for

approval.  *Id.*  CAA section 110(k) sets forth the process for EPA review of SIP submissions.  42

U.S.C. § 7410(k).

    EPA action on SIP submissions involves a two-step review process.  First, within 60 days

of EPA's receipt of a SIP submission, but not later than six months after the date by which the

State is required to submit the plan, EPA is required to make a threshold "completeness"

determination -- whether the submission meets the minimum criteria for submissions established

by EPA's regulations.  40 C.F.R. Part 51, App. V.  If EPA does not act within six months, the submittal is deemed complete by operation of law.  Second, if the State submittal is found to be complete by EPA or by operation of law, EPA is required to act on the submittal within 12 months of such time.  EPA may fully approve or disapprove, partially approve or disapprove, or conditionally approve the submittal.  42 U.S.C. § 7410(k).

### B.    Ozone Nonattainment Areas

In 1979, pursuant to 42 U.S.C. § 7409, EPA promulgated a NAAQS for ozone.[4]  The standard, 0.12 parts per million, was codified at 40 C.F.R. § 50.9.  *See generally American Petroleum Inst. v. Costle*, 665 F.2d 1176 (D.C. Cir. 1981) (discussing the standard and EPA's rationale for the standard).  Although the standard is expressed as a numerical level, attainment of the standard is expressed in terms of "expected exceedances" of the level, as follows:

> The standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 parts per million (235 F g/m³) is equal to or less than 1, as determined by Appendix H to this part.

40 C.F.R. § 50.9(a).  Ozone levels in an area are measured by air quality monitors which must meet technical criteria specified in 40 C.F.R. Part 58.  Appendix H to 40 C.F.R. Part 50 contains the methodology by which expected exceedances are calculated.  In summary, the ozone standard is exceeded if, after application of the methodology in Appendix H, the average number of exceedances at a given monitor is greater than one.

---

[4]    In 1997, EPA issued a regulation revising the ozone NAAQS, which, in part, established an eight-hour standard.  40 C.F.R. § 50.10.  However, the 1979 standard (the one-hour standard) continues to apply in all areas until EPA determines that a particular area has met that standard.  *Id.* § 50.9(b).  Because EPA has not made a determination that the D.C. Area has met the one-hour standard, that standard continues to apply to the Area.

### 1.        Classification

Pursuant to the CAA Amendments of 1990, EPA designated areas of the country as "attainment" or "nonattainment," depending upon whether they met the NAAQS for a particular pollutant, or "unclassifiable," if there was insufficient available information to classify an area.  42 U.S.C. § 7407(d).  The Amendments included specific provisions applicable to nonattainment areas bearing certain classifications.  CAA sections 181-85, 42 U.S.C. §§ 7511, 7511a to 7511d.[5]  Ozone nonattainment areas were classified according to the severity of air pollution, as "marginal," "moderate," "serious," "severe," or "extreme" areas.  42 U.S.C. § 7511a.

For each classification, the Act specifies both a deadline for attainment of the ozone NAAQS and the programs that the States must adopt in their SIPs in order to attain the NAAQS by reducing emissions of the precursors for the formation of ozone --volatile organic compounds ("VOC") and nitrogen oxide ("NOx").[6]  Congress designated November 15, 1999, and November 15, 2005, as the respective attainment dates for serious and severe ozone nonattainment areas respectively.[7]  42 U.S.C. § 7511(a)(1).

---

[5]      The classifications are based on the "design value" for a nonattainment area.  The design value is a measure of the severity of the ozone concentrations in an area based on the monitored values from all ozone monitors in the area.  For each monitor in an area, the fourth highest value over a three year period is determined.  The values for all monitors in the area are then compared and the highest of these values becomes the design value for the area.

[6]      Ozone is the result of a reaction between VOCs, NOx, and oxygen in sunlight.  *See* 61 Fed. Reg. 50,718, 50,719 (Sept. 27, 1996).

[7]      CAA section 181(a)(1) provides that the areas must attain the ozone standards "as expeditiously as practicable, but not later than the date" established by the statute for each classification.  42 U.S.C. § 7511(a)(1).  For the purpose of brevity, however, this memorandum will refer only to the statutory deadline.

**2.     Reclassification of Ozone Nonattainment Areas**

Section 181(b)(2)(A) of the Act directs EPA to determine the attainment status of each ozone nonattainment area within six months after the attainment date.  42 U.S.C. § 7511(b)(2)(A).  If EPA determines that an area has not attained the NAAQS by the attainment date, the area is reclassified by operation of law.  *Id.*  Within six months of the attainment date, the Act directs EPA to publish a Federal Register notice identifying the areas that EPA has determined have failed to meet the attainment date and identifying the new classification after taking public comment.  *Id.* § 7511(b)(2)(B).  The new classification will be the higher of either: (1) the next higher classification of the area or (2) the classification applicable to the area based on the actual air quality (design value) as of the date that EPA publishes the Federal Register notice.  *Id.* § 7511(b)(2)(A).

Upon reclassification, the area is subject to additional SIP requirements and receives a new, later attainment date.  *Id.* § 7511a(i).  Section 182(i) provides that, if an area is reclassified, EPA can adjust the deadlines for the required SIP submissions.  *Id.*

**3.     SIP Revisions for Ozone Nonattainment Areas Reclassified from Serious to Severe**

The CAA provides that a SIP for a severe nonattainment area must contain the elements required in SIPs for moderate and serious areas and additional specific elements that apply only to a severe area.  42 U.S.C. § 7511a(d) (incorporating *id.* § 7511a(c) by reference).  Section 182(d) provides that, for the purpose of the SIP requirements incorporated by reference from the subparts applicable in moderate or serious areas, "[a]ny reference to the term 'attainment date' . . . shall refer to the attainment date for Severe Areas [2005]."  *Id.* § 7511a(d).

When an area  is reclassified from serious to severe, the applicable SIP requirements change and the States must submit new SIPs to meet these new requirements.  For each area, the States must submit an "attainment demonstration SIP,"  which employs computer modelling prescribed by EPA to show that the measures included in the State SIP will provide for attainment of the ozone standard by the attainment date.  *Id.* § 7511a(c)(2)(A).  For an area reclassified as severe, the attainment demonstration SIP must show that the measures in the SIP will provide for attainment of the ozone NAAQS no later than 2005.

Another required SIP is the rate-of-progress plan.  An area reclassified as severe will need to make a new SIP submission to comply with the severe area rate-of-progress requirement of three-percent per year reductions in VOC and NOx emissions from 1999 until the area's new attainment date of 2005.  *See* 42 U.S.C § 7511a(b)(1)(A).  Previously, as a serious area, rate-of-progress reductions were only required through 1999.  *See id.* § 7511a(c)(2)(B).

Furthermore, although the SIPs for both serious and severe areas must impose restrictions on "major sources" of both VOCs and NOx emissions, the definition of major source differs for each classification.  In a serious area, a major source is a source that emits more than 50 tons per year, but in a severe area, the major source restrictions must apply to sources that emit more than 25 tons.  *Compare* 42 U.S.C. § 7511a(c) *with id.* § 7511a(d).  Moreover, in determining whether new major sources or modifications to existing major sources can be permitted, the SIP for a severe area must provide that the amount of any expected increases from new major sources or the modification of existing major sources must be offset by a somewhat greater amount of decreases in emissions from existing sources within the same nonattainment area than the decreases required in serious areas.  In serious areas, calculation of the offset must be based a

ratio of 1.2 to 1 (reductions to increases), whereas in severe areas, the ratio must be at least be 1.3 to 1 (unless other requirements are met, in which case the ratio can be reduced to 1.2:1). *Compare* 42 U.S.C. § 7511a(c)(10) *with id.* § 7511a(d)(2).

Finally, a SIP for a severe area must include additional measures to address expected increases in emissions from motor vehicles. For these areas, the SIP must "identif[y] and adopt[] specific enforceable transportation control strategies and transportation control measures to offset any growth in emissions from growth in vehicle miles traveled or numbers of vehicle trips in the area." *Id.* § 7511a(d)(1)(A). In addition, for severe areas, the SIPs may include requirements for employers to reduce work-related travel in accord with guidance developed by EPA. *Id.* § 7511a(d)(1)(B).

## II.    FACTUAL BACKGROUND

The D.C. Area was originally classified as a serious nonattainment area. From 1997 through 2000, the States submitted the attainment demonstration and rate-of-progress SIPs (including various amendments) required for serious areas. EPA approved these SIPs, 66 Fed. Reg. 586 (Jan. 3, 2001), but the approval was subsequently vacated by the D.C. Circuit. *Sierra Club. v. EPA*, 294 F.3d 155 (D.C. Cir. 2002). EPA's approval of the attainment demonstration SIPs was premised on the Agency's conclusion that the applicable attainment date could be extended to 2004 without reclassifying the D.C. Area as severe due to the impact of transported pollutants. In relevant part, the D.C. Circuit held that EPA lacked legal authority to extend the D.C. Area's attainment date due to the effect of transported pollutants. *Id.* at 160-61. The court also ruled that the rate-of-progress and attainment demonstration SIPs lacked necessary

contingency measures.  Accordingly, the court vacated EPA's final approval of the SIPs and remanded the matter to EPA for further consideration.  *Id.* at 164.

In response to the D.C. Circuit's decision, EPA has published a notice of proposed rulemaking that would result in the reclassification of the D.C. Area to severe.  67 Fed. Reg. at 68,805.  EPA further proposed that, if the Area is reclassified, the States should be allowed one year from the date of EPA's final action on the rule (but no later than March 2004) to submit the SIPs necessary for a severe area.  The period for public comment on this proposal will end on December 13, 2002.  EPA will then consider the comments and prepare a response thereto.  The Agency intends to take final action on the attainment determination no later than January 27, 2003.  Katz Decl. ¶ 9.

EPA has not undertaken additional rulemaking to approve or disapprove the rate-of-progress or attainment date demonstration SIPs submitted in 1999 when the D.C. Area was classified as a serious nonattainment area.

## STANDARD OF REVIEW

In *Weinberger v. Romero-Barcelo*, the Supreme Court explained the standard to be used in determining whether injunctive relief should be issued in a citizen suit authorized by a federal environmental statute.  The Court explained that there was no absolute entitlement to injunctive relief.

> It goes without saying that an injunction is an equitable remedy. It "is not a remedy which issues as of course," or "to restrain an act the injurious consequences of which are merely trifling."
>
>        *             *          *
>
> The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting

> as chancellor is not mechanically obligated to grant an injunction for every
> violation of law.

456 U.S. 305, 313 (1982).  *See also United States v. Oakland Cannabis Buyers Cooperative*, 532

U.S. 483, 496 (2001) ("District courts whose equity powers have been properly invoked have

discretion in fashioning injunctive relief, in the absence of a statutory restriction which clearly

provides otherwise.").

## ARGUMENT

## I.   INJUNCTIVE RELIEF ON THE BUMP-UP CLAIM IS UNNECESSARY

EPA acknowledges that it is subject to a mandatory duty to take final action on the

attainment determination required by CAA section 181(b)(2), which, under the statute is the basis

for reclassification by operation of law.  42 U.S.C. § 7511(b)(2).  EPA has already published a

proposed rule; final action on this rule will fully discharge the Agency's obligation under the

statute.  EPA intends to sign the final rule no later than January 27, 2003.  The only difference

between this schedule and the schedule Sierra Club has asked the Court to impose through a

mandatory injunction is that some additional time will elapse before publication because of the

need for the Office of the Federal Register to complete its tasks.  *See infra* at 4 n.3.

Given the lack of a significant difference between EPA's schedule and that proposed by

Sierra Club, it is simply unnecessary for the Court to exercise its equitable discretion, particularly

since the date for EPA's action is less than two months from the date of this brief.  The value of

any relief ordered under these circumstances would be minor, at best, and so does not justify the

remedy of a permanent injunction as requested by Sierra Club.

II.     **THE COURT SHOULD DEFER RULING ON THE ATTAINMENT
        DEMONSTRATION SIP CLAIM UNTIL THERE HAS BEEN A FINAL
        DETERMINATION ON THE BUMP-UP**

EPA recognizes that, as a general matter, CAA section 110(k)(2), 42 U.S.C. §

7410(k)(2), imposes a deadline by which EPA must take final action on a SIP.  Sierra Club's

request for an immediate injunction establishing a schedule for EPA to take final action to

approve or disapprove the attainment demonstration SIPs submitted in 1999, however, ignores

the consequences that would result if the area is reclassified from a serious to a severe

nonattainment area as EPA has proposed.

As explained below, when section 110(k)(2) is construed in light of CAA sections 181 and

182, 42 U.S.C. §§ 7511, 7511a, which are specific to ozone nonattainment areas, it is clear that

reclassification would end the Agency's responsibility with respect to 1999 attainment

demonstration SIP submissions, which are premised on the Area's current status as a serious

ozone nonattainment area.  If the Area is reclassified as severe, the Agency will no longer have a

duty to act on the 1999 attainment demonstration SIPs.  The proper classification for the D.C.

Area will be determined by the end of January 2003.  The Court should withhold consideration of

Sierra Club's attainment demonstration SIP claim until then so as to avoid issuing an order that

could well become moot within a few weeks.

Neither section 110(k)(2) nor sections 181 and 182 expressly address the effect that

reclassification should have on EPA's duty to take final action to approve or disapprove

attainment demonstration SIPs that were submitted to meet the requirements applicable *before* an

area is reclassified.  EPA's conclusion that its obligation to act on the 1999 attainment

demonstration SIPs for a serious classification will end if the D.C. Area is reclassified to severe is

the most reasonable interpretation of the statute because it best reconciles the provisions of section 110(k)(2) and sections 181.

In drafting section 181, Congress decided that reclassification would result in both (1) a later attainment date and (2) the imposition of new and more demanding requirements that would supersede those applicable to the area's previous classification.  *See infra* at 7-9 (comparing therequirements for a serious ozone attainment area to those applicable to a severe area).  Therefore, even where a State has submitted a fully-approvable attainment demonstration SIP for a serious nonattainment area, that SIP would be rendered inadequate immediately upon reclassification.

Under these circumstances, interpreting the statute as requiring EPA to take action on an attainment demonstration SIP submitted for a serious area *after* the area has been reclassified as severe would be to require the expenditure of Agency resources on a meaningless exercise; the outcome of such a rulemaking has been predetermined by Congress.[9]  Any interpretation of the statute that would result in a meaningless rulemaking is unreasonable.  Nothing in the CAA indicates that Congress intended for EPA and the States expend resources on such an exercise; upon reclassification, these resources should be focused on efforts to meet the severe area SIP requirements.

Sierra Club may argue that a rulemaking to approve or disapprove the 1999 attainment demonstration SIPs would not be meaningless, even though the outcome is predetermined by the

---

[9]      In this particular case, Sierra Club might argue that the outcome has been determined by the opinion issued by the D.C. Circuit in granting the petition for review, but that argument has no bearing on the proper interpretation of the statute.  The statute must be interpreted as it would apply in every instance where an area was reclassified; the proper interpretation cannot depend on the D.C. Circuit's decision that EPA's approval of specific SIPs for one area should be vacated.

statute itself, because a final rule disapproving the SIPs would start the clocks running for

sanctions under 42 U.S.C. § 7509(a), and for promulgation of a Federal Implementation Plan

("FIP"), *id.* § 7410(c)(1).[9]  Moreover, a disapproval would also cause an immediate

transportation conformity "freeze," unless EPA makes a "protective finding."  *See* 40 C.F.R. §§

93.120(a)(2) and (a)(3).  This means that no transportation plan, Transportation Improvement

Program ("TIP"), or project not in the first three years of the currently conforming plan and TIP

may be found to conform to the SIP.  In order for a transportation plan, TIP, or project to receive

Federal funds it must be found to conform.  A conformity freeze effectively stops the addition of

new transportation projects to the transportation plan and TIP, absent a protective finding.[10]

There is nothing in the CAA, however, that suggests Congress intended sanctions to

apply, a FIP to be promulgated, or a conformity freeze imposed based on the States' failure to

satisfy superseded SIP requirements.  Under section 179(a), if EPA disapproves a SIP, sanctions

are to be imposed unless the State cures the deficiency within 18 months of EPA's action.  42

U.S.C. § 7509(a).  Disapproval also triggers EPA's obligation to promulgate a FIP within two

years of EPA's action unless (1) the State submits a revised SIP and (2) EPA approves the SIP.

42 U.S.C. § 7410(c)(1).

---

[9]      EPA agrees that it has a mandatory duty to act on the 1999 rate-of-progress SIPs
covering the period from 1996-1999.  *See supra* 18.  If these SIPs are disapproved, the sanctions
and FIP clocks will be triggered.  The sanction clock will stop if rate-of-progress SIP revisions are
submitted; the FIP clock will continue until EPA has approved the revised rate-of-progress SIPs.

[10]     In CAA section 176(c), 42 U.S.C. § 7506(c), Congress established the requirement that
transportation planning actions by the States must conform to the applicable SIPs in order to be
eligible for federal highway funding.  EPA has adopted regulations implementing the conformity
requirements applicable to transportation actions.  40 C.F.R. Part 93.  The conformity process is
explained at length in *Environmental Defense Fund, Inc. v. EPA.*, 82 F.3d 451 (D.C. Cir.1996)
(denying petition for review of EPA's conformity regulations).

In this case, if EPA were to disapprove the 1999 attainment demonstration SIPs as the result of the rulemaking sought by Sierra Club, the clocks for sanctions and FIPs would be triggered as of the date of that rulemaking, as would the conformity consequences.  In order to avoid sanctions and a FIP, as well as potential conformity issues, the States would have to submit the severe area attainment demonstration SIP revisions within 18 months of EPA's final action and EPA would have to take final action approving those SIPs within six months of their submission.

This outcome is inconsistent with section 182(i), which explicitly authorizes EPA to adjust the schedules for the submission of the newly-required SIPs after an area has been reclassified.  42 U.S.C. § 7511a(i).  By enacting this provision, Congress acknowledged that the preexisting deadlines for SIP submissions no longer apply after reclassification; once an area has been reclassified, the States must be afforded additional time to draft SIPs to meet the newly-applicable requirements.

Section 182(i) allows EPA discretion in setting the new deadlines based on the Agency's evaluation of the amount of time reasonably necessary for the States to properly complete the new SIPs, thereby making it more likely that the submissions will meet the statutory requirements for approval by EPA.  For the D.C. Area, EPA has proposed deadlines for submission of the severe area SIPs as part of the proposed attainment determination.  67 Fed. Reg. at 68,805.  These deadlines were based on the Agency's consideration of the particular issues that the States would have to address in developing the new attainment demonstration SIPs.  For example, these SIPs must be premised on the most recent mobile sources emission factors model (referred to as "MOBILE6"), which was issued by EPA in January 2002.  *Id.*

The remedy sought by Sierra Club would deprive section 182(i) of much of its meaning. The pressure to avoid sanctions and/or a FIP, as well as a conformity freeze, would drive the States and EPA to rush to complete the tasks necessary for final approval of the severe area attainment demonstration SIPs before those consequences were triggered, rather than by the deadlines to set by EPA under section 182(i).  This result could render the new deadlines irrelevant in a practical sense, thereby undermining the plain intent of section 182(i), which is clearly intended to allow EPA discretion to determine the amount of time necessary for the States to prepare the new SIPs .

For these reasons, EPA's obligation to take final action to approve or disapprove the 1999 attainment demonstration SIPs will end if the D.C. Area is reclassified and a new schedule for submission of the severe area attainment demonstration SIPs is established by EPA.  In that event, an injunction requiring EPA to initiate a rulemaking addressing the 1999 attainment demonstration SIPs would become moot.  Under these circumstances, the Court should postpone consideration of Sierra Club's claim as to the attainment demonstration SIP until EPA has completed the bump-up rulemaking.  Given that EPA intends to sign the final rule by January 27, 2003, any delay that could be caused by such a postponement would be too insignificant to cause any injury to Sierra Club or its members.

III.   **IF THE COURT WERE TO GRANT SIERRA CLUB'S REQUEST FOR AN INJUNCTION ON THE ATTAINMENT DEMONSTRATION SIPS, EPA SHOULD BE ALLOWED ADDITIONAL TIME FOR PUBLICATION OF THE FINAL RULE**

With respect to the attainment demonstration SIP rulemaking, Sierra Club has requested that the Court require EPA to:  (1) publish a notice of proposed rulemaking no later than 45 days after the date of the Court's order; and (2) take final action on the proposed rule within 120 days of the order.  This schedule, however, is unreasonable.

Many courts, when "faced with violations of . . . seemingly absolute deadlines have concluded that the only practical response . . . is to require compliance within a reasonable time." *Atlantic Terminal Urban Renewal Area Coalition v. New York City Dep't of Envtl. Protection*, 740 F. Supp. 989, 997 (S.D.N.Y. 1990).  For the reasons set forth in the Katz Declaration, EPA would require the following time periods in order to properly complete this rulemaking:  45 days from the later of the Court's Order or January 1, 2003, to sign the proposed rulemaking;[1] 30 days after Federal Register publication for public comment; and 105 days after close of the public comment period to sign the final rule.  *Id.* ¶ 9.  While this schedule is 60 days longer than that proposed by Sierra Club (and does not include the time for Federal Register publication), EPA's schedule will ensure that the rulemaking will meet the standards established by the Administrative Procedure Act.  In particular, it will ensure that EPA has enough time to adequately respond to the comments received.  *See id.*  ¶ 10.

IV.   **EPA SHOULD BE ALLOWED ADDITIONAL TIME FOR PUBLICATION OF THE FINAL RULE ON THE RATE-OF-PROGRESS SIPS**

---

[1]     Because this proceeding is on an expedited schedule, the Court may issue its decision promptly after the hearing on December 18, 2003.  Because of the holidays, however, EPA would not have the personnel available to commence work on the rulemaking until after January 1, 2003.

EPA has a duty to take final action on the 1999 rate-of-progress SIPs.  If the D.C. Area is reclassified, the States will be required to submit additional rate-of-progress SIPs that will demonstrate the *additional* reductions required for each year between 1999 (the attainment date for serious areas) and 2005 (the attainment date for severe areas).  Reclassification to a severe area would not affect the continuing usefulness of EPA's action to approve or disapprove the 1999 rate-of-progress SIPs, however.  A severe area still has to meet the requirement of 3% emissions reductions for each year between 1996 and 1999.  Reclassification to severe status would result in an additional requirement to achieve 3% per year reductions for the additional years between 1999 and the new attainment date of 2005.  Consequently, if reclassified, the D.C. Area would still have to satisfy its pre-existing serious area obligation of achieving rate-of-progress reductions for the 1996-99 period and EPA's obligation to act on the rate-of-progress SIP covering that period of time would not be superseded as a consequence of reclassification.[12]

Although EPA agrees with Sierra Club that it must take final action to approve or disapprove the 1999 rate-of-progress SIPs, the schedule proposed by Sierra Club is unreasonable.  To properly complete this rulemaking, EPA will require until February 15, 2003, to sign the proposed rule; the comment period will then consume 30 days after publication; and then the

---

[12]      At this time, EPA does not have a mandatory duty to act on rate-of-progress SIPs covering the period from 1999-2005.  As a serious nonattainment area, the D.C. Area has only an obligation to submit an rate-of-progress SIP covering the period through 1999; the 1999 rate-of-progress SIP addressed this period.  Not until a serious area is reclassified to severe is it required to submit an rate-of-progress plan covering the period from 1999-2005.  The deadline for submission of the rate-of-progress SIP addressing these additional years will be established by EPA pursuant to 182(i) and EPA's obligation to act on these newly required SIPs will begin as of that deadline. Consequently, EPA will not have a mandatory duty to act on a rate-of-progress plan covering the post-1999 period until the deadline for the submission of such a plan in the future.

Agency will need 105 days after the close of the public comment period to complete the rulemaking process and sign the rule.  Katz Decl. ¶ 9.  Although the date for final signature cannot now be stated with certainty because EPA cannot predict when the proposal will be published in the Federal Register, thereby starting the 30-day comment period, signature of the final rule should occur during mid-July 2003.

## CONCLUSION

For these reasons, Sierra Club's request for injunctive relief with respect to the bump-up rulemaking should be denied.  The Court should defer consideration of the attainment demonstration SIP claim until after  the final bump-up rule has been published, or, if the Court does order a rulemaking on this issue, the Court should adopt the schedule proposed by EPA. Finally, the schedule to be ordered for EPA to sign the final rule on the 1999 rate-of-progress SIP should be that proposed by EPA, rather than by Sierra Club.

Respectfully submitted,

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources
        Division


  /s/ Eileen T. McDonough

EILEEN T. MCDONOUGH
Senior Attorney
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 514-3126

December 6, 2002

IN THE UNITED STATES COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
SIERRA CLUB,                        )
                                    )
           Plaintiffs,              )
                                    )
      v.                            )      1:02CV02235(JR)
                                    )
CHRISTINE TODD WHITMAN,             )
Administrator, United States        )
Environmental Protection Agency,    )
           Defendants.              )
_____     )
```

**ORDER**

Upon consideration of Sierra Club's Application For Preliminary And Permanent

Injunction Motion and EPA's Opposition Thereto, it is hereby ordered as follows:

1.     EPA shall take action to approve or disapprove the rate-of-progress State

Implementation Plans ("SIPs") submitted in 1999 for the Washington, D.C., ozone nonattainment

area ("D.C. Area") according to the following schedule:  (a) EPA will sign the proposed rule no

later than February 15, 2003; (b) there will be a 30-day period for public comment after the

proposed rule is published in the Federal Register; and (c) EPA will sign the final rule no later

than 105 days after the close of the public comment period.

2.     Sierra Club's request for injunctive relief on its claim with respect to a rulemaking

on reclassification is denied; and

3.     The Court will defer ruling on Sierra Club's claim with respect to the attainment

demonstration SIPs for the D.C. Area submitted in 1999 pending publication of the final

reclassification rule because, if the D.C. Area is reclassified to severe, EPA will no longer have a

mandatory duty to act on the 1999 attainment demonstration SIPs.

Executed this ___ day of _____.


_____
HON. JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

**CERTIFICATE FOR SERVICE OF ORDERS**

DAVID S. BARON
Earthjustice Legal Defense Fund
1625 Massachusetts Ave., N.W.
Suite 702
Washington, D.C.  20036-2212

EILEEN T. MCDONOUGH
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-3986

**CERTIFICATE OF SERVICE**

I hereby certify that on December 6, 2002, a copy of the foregoing was served through the

Court's electronic case filing system upon:

> David S. Baron
> Earthjustice Legal Defense Fund
> 1625 Massachusetts Ave., N.W.
> Suite 702
> Washington, D.C.  20036-2212


     /s/ Eileen T. McDonough